## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JAMES YORK and**
**JODIE YORK**,

        Plaintiffs,

        vs.                         No. CIV 06-683 MCA/CEG

**CITY OF LAS CRUCES,**
**CHRIS GALLEGOS, FRANK LUCERO**
**and GREG MARTINEZ,**

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' *Motion for Summary Judgment as to Plaintiffs' Federal Claims* [Doc. 15], filed November 1, 2006.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion in part and denies the motion in part.

## I. BACKGROUND

The following facts and/or allegations are viewed in a light most favorable to the Plaintiffs, James and Jodie York, as the parties opposing summary judgment.  See Stone v. Juarez, 2006 WL 1305039, at *9 (D.N.M. Apr. 23, 2006).

On the afternoon of August 14, 2004, Mr. and Mrs. York were driving through the parking lot of a Target store in Las Cruces, New Mexico, searching for a parking spot. When Mr. York observed a vehicle exiting its space, he stopped and waited for that space

to become available.  Before the Yorks could pull in, however, another car pulled through from the opposite side and took the space for which the Yorks had been waiting.  As Mr. York drove on, he shouted either "Bitch" or "What a bitch," apparently in reference  to the female drive of the other car.  The windows on the Yorks' vehicle were not completely closed and, as a result, Defendant/Officer Chris Gallegos of the Las Cruces Police Department, who was in the Target parking lot verifying handicap placards of vehicles parked there, overheard Mr. York's comment.  Officer Gallegos noticed that two people in the parking lot, a man and a child of about six years old, appeared also to have heard Mr. York's remark and turned and looked at Officer Gallegos as if to ask, "Well, what are you going to do?".

Believing that Mr. York had just committed the misdemeanor of disorderly conduct, Officer Gallegos pulled up behind the Yorks, dismounted his motorcycle, and asked Mr. York, "Who are you calling a bitch?"  [Doc. 16; Ex. E, copy of belt tape].  Mr. York told Officer Gallegos that he was not referring to Officer Gallegos and so "not to worry about it." [Doc. 21; Exh. A, Oct. 17, 2006 depo. of Officer Chris Gallegos at 44-45].  Officer Gallegos attempted to explain to Mr. York that, regardless of to whom he might have been directing his comment, Mr. York had caused a disturbance.  Mr. York told Officer Gallegos that he understood what Officer Gallegos was telling him, but wanted to know what Officer Gallegos was going to do about the woman who had taken "his" parking space.  Officer Gallegos responded that he did not see the woman pull through the space and that, in any

2

event, she did not "make herself known" as Mr. York had.  [Id.].  Mr. York and Officer Gallegos then disagreed as to whether Officer Gallegos was harassing Mr. York or merely attempting to deal with an issue of disorderly conduct.  [Doc. 16; Ex. E, belt tape].  By this time, Defendants/Officers Frank Lucero and Greg Martinez had arrived on the scene in response to Officer Gallegos's request for backup, which request Officer Gallegos made because he believed Mr. York had become belligerent.  [Doc. 16; Exh. A at 2].  Officers Gallegos and Lucero then stepped away to discuss a potential arrest of Mr. York.  Officer Lucero agreed that probable cause existed to arrest Mr. York for disorderly conduct.  [Doc. 16; Exh. A at 3; Exh. B at 3].  Officer Gallegos's basis for arresting Mr. York for disorderly conduct was that Mr. York had shouted a profanity in a crowded public area.  [Doc. 16 at 15].

Because he considered Mr. York a "belligerent suspect[]," Officer Gallegos made the decision not to inform Mr. York that he was being placed under arrest until after having made physical contact with him.  [Doc. 16; Exh. A at 3].  Accordingly, without first telling Mr. York that he was being arrested, Officer Gallegos reached out, grabbed Mr. York, and told him to turn around.  [Doc. 21; Exh. A at 113].  Because Mr. York pulled his arm back, Officer Gallegos charged him with resisting arrest.  [Doc. 21; Exh. A at 115-116].  State-court charges of disorderly conduct and resisting or obstructing/evading an officer that were filed against Mr. York were dismissed on a directed verdict after the presentation of the City's case.  [Doc. 1; Exh. 2].

On August 1, 2006, the Yorks filed their *Complaint for Violation of Rights Secured by the Constitution of the Untied* [sic] *States of America and the State of New Mexico, Battery, False Imprisonment, False Arrest, Malicious Prosecution [Malicious Abuse of Process] and Intentional Infliction of Emotional Distress*.  [Doc. 1].  The Yorks allege, among other things, that (1) the actions of Officers Gallegos, Lucero, and Martinez ("the individual Defendants") deprived them of rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution; (2) the individual Defendants' actions are part of a pattern or practice on the part of law enforcement officers employed by Defendant City of Las Cruces and, therefore, constitute a policy of the City; and (3) the City failed to use ordinary care in the hiring and retention of the individual Defendants.  [See generally Doc. 1].  More specifically, Mr. York contends that he was arrested without probable cause and that the individual Defendants used excessive force in effecting his arrest.  [Id. at 5].  Mrs. York, who witnessed the arrest, asserts a claim for the denial of her right to substantive due process, based on the individual Defendants' alleged intentional infliction of emotional distress.  [Doc. 21 at 22].  The individual Defendants now move for summary judgment on the ground of qualified immunity, arguing that their arrest of Mr. York did not violate clearly established law.  The City similarly moves for summary judgment on the ground that it is not subject to municipal liability under the circumstances.  [See generally Doc. 16].

## II. ANALYSIS

### A. Standard of Review

#### 1. Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.  It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### 2. 42 U.S.C. § 1983 and the Defense of Qualified Immunity

The Yorks bring this action pursuant to 42 U.S.C. § 1983.  Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere, see Albright v. Oliver, 510 U.S. 269, 271 (1994), and provides a remedy "for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." Curley v. Klem, 298 F.3d 271, 277 (3rd Cir.2002).  Accordingly, an analysis of a plaintiff's federal civil-rights claim necessarily begins by identifying the specific constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

In this case, Mr. York asserts that his First and Fourth Amendment rights were violated when Officer Gallegos (apparently assisted by Officers Lucero and Martinez)

6

arrested him without probable cause, based on Mr. York's use of the word "bitch" in a public place.  [See Doc. 21 at 11].  Mr. York also alleges that he was denied his Fourth Amendment right to be free from the use of excessive force during the arrest.  [Id. at 20-21].  Mrs. York maintains that, having witnessed the use of excessive force against her husband, she was denied her Fourteenth Amendment right to be free from the intentional infliction of emotional distress.  [Id. at 22].  The individual Defendants have moved for summary judgment on the ground of qualified immunity.  [See Docs. 15, 16].

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right.  Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (citing Reynolds v. Powell, 370 F.3d 1028, 1030 (10th Cir.2004)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, however, a violation has been shown, the next step in the qualified- immunity sequence is to ask whether the constitutional right was clearly established when the alleged conduct occurred.  See Cortez, 478 F.3d at 1114.  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ."  Saucier, 533 U.S. at 201.  Indeed, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202.  This is not to say, however, that an official action is protected by

qualified immunity unless the very action in question has previously been held unlawful. Rather, it is to say that the unlawfulness must be apparent in light of pre-existing law.  Hope v. Pelzer, 536 U.S. 730, 739 (2002).

For a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains.  Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002).   An official can still be on notice that his conduct violates established law even in novel factual circumstances; the "salient question" is whether the state of the law at the relevant time gave him fair warning that the conduct at issue was unconstitutional.  See  Hope, 536 U.S. at 741. By contrast, summary judgment based on qualified immunity is appropriate if the law did not put the defendant on notice that his conduct was clearly unlawful.  Saucier, 533 U.S. at 202.  If, however, the plaintiff successfully establishes both a violation of a constitutional right and that the right was clearly established at the time of the alleged conduct, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law.  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir.2002)).  "In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense."  Id.

**a. Mr. York's Claims with Respect to the Individual Defendants**

**1. Whether Probable Cause Existed for Mr. York's Arrest**

With regard to Mr. York's contentions, this Court's threshold inquiry in the qualified-immunity analysis is whether, taking Mr. York's allegations as true, the individual Defendants violated his Fourth Amendment right to be free from an unreasonable seizure when they arrested him for disorderly conduct based on his use of the word "bitch" in public. See Walker v. City of Orem, 451 F.3d 1139, 1145 (10th Cir. 2006). "A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." Olsen, 312 F.3d at 1312. Probable cause "exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Id. (internal quotations omitted). The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest. Michigan v. DeFillippo, 443 U.S. 31, 36 (1979). Instead, "[w]hat matters is whether, looking at the totality of the circumstances at the time of the arrest, the objective facts available to the officers . . . were sufficient to justify a reasonable belief that an offense was being committed." Johnson v. Campbell, 332 F.3d 199, 211 (3rd Cir. 2003) (internal quotations and citations omitted). When a warrantless arrest is the subject of a § 1983 action, the

9

defendant/arresting officer is entitled to immunity if a reasonable officer could have believed that there existed probable cause to arrest.  Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995).  To be sure,  "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."  Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*quoting* Anderson v. Creighton, 483 U.S. 635, 641(1987)).

Section 19-87 of the Las Cruces Municipal Code, pursuant to which Officer Gallegos arrested Mr. York, provides as follows:

> (a) Disorderly conduct consists of:
>
> (1) Engaging in violent, abusive, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace; or
>
> (2) Maliciously disturbing, threatening or, in an insolent manner, intentionally touching any house occupied by any person.
>
> (b) A person who commits disorderly conduct is guilty of a petty misdemeanor.

LAS CRUCES, N.M., CODE § 19-87 (1988).[1]  The language of § 19-87, however, may not be

---

[1] Section 19-87 is virtually identical to § 30-20-1 of the New Mexico Statutes, which provides as follows:

> Disorderly conduct consists of:
>
> A. engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace; or
>
> B. maliciously disturbing, threatening or, in an insolent manner, intentionally touching any house occupied by any person.

sufficiently comprehensive in certain situations, because when the regulated conduct consists entirely of speech, the applicable statute or ordinance must be "carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." Gooding v. Wilson, 405 U.S. 518, 522 (1972).  Indeed, "New Mexico courts have held that a court must first satisfy itself that a conviction [for disorderly conduct] does not "'offend the [F]irst and [F]ourteenth [A]mendments' right of free speech.'" Stone, 2006 WL 1305039, at *5 (quoting State v. James M., 806 P.2d 1063, 1065 (N.M. App.1990)).  To bring disorderly-conduct statutes within constitutional limits, therefore, New Mexico courts have narrowly construed them to punish only "fighting words." James M., 806 P.2d at 1068 (rejecting contention that NMSA 30-20-1, the state counterpart to § 19-87 of the Las Cruces Municipal Code, is unconstitutionally overbroad because "[b]y narrowly construing the statute to punish only 'fighting words,' [courts can] avoid any punishment of speech that is protected under the [F]irst and [F]ourteenth amendments.").

"The unprotected category of speech called 'fighting words' is an extremely narrow one[, since t]he First Amendment on the whole offers broad protection for speech, be it unpleasant, disputatious, or downright offensive." Johnson v. Campbell, 332 F.3d 199, 212 (3rd Cir. 2003).  Put another way, freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, "unless shown likely to produce a clear and

---

Whoever commits disorderly conduct is guilty of a petty misdemeanor.

11

present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Terminiello v. City of Chicago, 337 U.S. 1, 4, (1949). Indeed, to be punishable, words must do more than bother the listener; they must be nothing less than "an invitation to exchange fisticuffs." Texas v. Johnson, 491 U.S. 397, 409 (1989); see also Cohen v. California, 403 U.S. 15, 18 (1971) (reversing conviction of defendant who wore jacket bearing inscription "F**k the draft" inside courthouse, and explaining that because "there [was] no showing of an intent to incite disobedience to or disruption of the draft, Cohen could not, consistently with the First and Fourteenth Amendments, be punished for asserting the evident position on the inutility or immorality of the draft his jacket reflected.").

"Fighting words" are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572 (1942). The Tenth Circuit defines "fighting words" as epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas. Cannon v. City and County of Denver, 998 F.2d 867, 873 (10th Cir. 1993). "Fighting words are not a means of exchanging views, rallying supporters or registering a protest; they are directed against individuals to provoke violence or inflict injury." R.A.V. v. City of St. Paul, 505 U.S. 377, 401 (1992) (White, J., concurring). On the other hand, even derogatory language, so long as it is not personally directed at another individual, is not likely to incite an immediate breach of the peace. Gilles v. Davis, 427 F.3d 197, 205 (3rd Cir. 2005). Armed with this fuller understanding of the First Amendment restrictions, the Court now turns to the particular facts of Mr. York's situation.

Officer Gallegos, believing that a criminal act had been committed as soon as Mr. York shouted the word "bitch," has explained that his "basis for arresting Mr. York for disorderly conduct was that he shouted a profanity in a crowded area, causing at least three people to react." [Doc. 16; Exh. A, Affidavit of Chris Gallegos at 3]. But "[t]he mere fact that people may have heard [the] remarks, however loud or offensive they may have been, is insufficient to support a charge of disorderly conduct. *There must be evidence that the remarks were likely to incite the listeners to breach the peace*." State v. Hawkins, 991 P.2d 989, 992 (N.M.App. 1999) (emphasis added). There is no such evidence in this case. In fact, there is no evidence in the record (nor is there any allegation) that Mr. York was acting threateningly or tumultuously or was otherwise out of control. To the contrary, when viewed in a light most favorable to Mr. York, the evidence supports the conclusion that, when he made his remark, Mr. York was still in his vehicle, approximately seven parking spots away from the space that had just been "taken" from him, continuing to drive on in search of another place to park. [See Doc. 16; Exh. C, Affidavit of James York at 1; Exh. D, Affidavit of Jodie York at 1 (explaining that when Mr. York made his comment, the Yorks' vehicle "was moving forward.")]. Mr. York was not excitedly provoking a fight, see James M., 806 P.2d at 865; he was not drunkenly and boisterously causing alarm, see Salas, 986 P.2d at 486-487; and he was not acting so hostilely or confrontationally as to be likely to incite a riot, see Gilles, 427 F.3d at 206. In short, the "conduct" for which Mr. York was arrested consisted merely of the word he spoke. For that reason, probable cause for the arrest cannot be said to have existed unless Mr. York was employing "fighting words." See James M.,

806 P.2d at 1068.

Having reviewed the totality of the circumstances that confronted Officer Gallegos, this Court cannot say that any reasonable police officer would have believed that Mr. York's use of the word "bitch" amounted to the use of "fighting words." See United States v. McKinney, 9 Fed.Appx. 887, 890 (10th Cir. 2001) (given totality of circumstances, defendant's invitation to military police officer to "go f**k himself" did not constitute "fighting words"). For one thing, there is no evidence in the record that Mr. York's comment was directed at anyone in particular, as opposed to being a verbal reflection of his frustration at having "lost" the parking space for which he had been waiting. In fact, Officer Gallegos testified through his deposition that the first question he asked Mr. York when he stopped him was who Mr. York was calling "bitch." [Doc. 16; Exh. A, Oct. 17, 2006 depo. of Chris Gallegos at 43]. As explained earlier, even derogatory language, so long as it is not personally directed at another individual, is not likely to incite an immediate breach of the peace and does not properly fall within the definition of "fighting words." See Gilles, 427 F.3d at 205; see also Cannon, 998 F.2d at 873.

More importantly, "the very definition of 'fighting words,'" is "words [that] cause [somebody] to fight or become angry[.]" Johnson, 332 F.3d at 213. Not even Officer Gallegos has asserted that that happened in this case. Instead, Officer Gallegos testified that, after he heard Mr. York's exclamation, he saw two people, a man and a child, turn around and look at him as if to ask, "Well, what are you going to do?". [Doc. 16; Exh. A at 38]. Although Officer Gallegos has testified that believes the crime of disorderly conduct occurs

14

when one person's "boisterous" conduct offends another, see id. at 65, "'[v]ulgar language, however distasteful or offensive to one's sensibilities, does not evolve into a crime because people standing nearby stop, look, and listen." Hawkins, 991 P.2d at 992 (quoting People v. Douglas, 331 N.E.2d 359, 363 (Ill.App. 1975)).

The Court further concludes that the right to be free from arrest based on speech alone, when that speech does not amount to "fighting words," was clearly established on August 14, 2004, the day of Mr. York's arrest. See Farmer, 288 F.3d at 1259 (for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains). As early as 1942, "fighting words" were defined as "epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace." Chaplinsky, 315 U.S. at 574. More recently, the Tenth Circuit in 2001 reversed a conviction for disorderly conduct under a Kansas statute[2] where, in response to inquiries from a military police officer,

---

[2]     Disorderly conduct is, with knowledge or probable cause to believe that such acts will alarm, anger or disturb others or provoke an assault or other breach of the peace:

(a) Engaging in brawling or fighting; or

(b) Disturbing an assembly, meeting, or procession, not unlawful in its character; or

(c) Using offensive, obscene, or abusive language or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others.

Disorderly conduct is a class C misdemeanor.

KAN. STAT. ANN. § 21-4101 (2005).

the defendant twice told the officer to "go f**k himself."  McKinney, 9 Fed.Appx. at 888.

Explaining that the disorderly-conduct statute prohibited only "fighting words," the Court

reasoned that the defendant's "conviction [could] stand only if her remarks would have

"'provoke[d] the average person to retaliation, and thereby cause[d] a breach of the peace.'"

Id. (quoting Chaplinsky, 315 U.S. at 574).  The Court concluded that the remarks, though

tasteless and offensive, would not provoke a reasonable person to violence or incite an

immediate breach of the peace.  The defendant did not threaten or offer to fight the officer,

and the fact that the defendant "left the officer's presence each time after telling the officer

to "go f* * * himself," diffus[ed] the provocative nature of her remarks."  Id. at 890.

Johnson is equally instructive.  The defendant in Johnson, who muttered "son of a

bitch" in the presence of a police officer who had stopped him and asked for identification,

was arrested for having violated Delaware's disorderly-conduct statute.[3]  Specifically, the

---

[3]     A person is guilty of disorderly conduct when:

(1) The person intentionally causes public inconvenience,
annoyance or alarm to any other person, or creates a risk thereof
by:
a. Engaging in fighting or in violent, tumultuous or threatening
behavior; or
b. Making an unreasonable noise or an offensively coarse
utterance, gesture or display, or addressing abusive language to
any person present; or
c. Disturbing any lawful assembly or meeting of persons without
lawful authority; or
d. Obstructing vehicular or pedestrian traffic; or
e. Congregating with other persons in a public place and refusing
to comply with a lawful order of the police to disperse; or
f. Creating a hazardous or physically offensive condition which

defendant was arrested "for his use of profane language in public."  <u>Johnson</u>, 332 F.3d at

203.  After determining that the Delaware Code prohibits only that speech falling within the

narrow definition of "fighting words," the Third Circuit held that no probable cause existed

for the arrest.  The Court explained:

> [V]iewed objectively, none of Johnson's other actions, as described by [police officer] Campbell himself, amounted to threatening or tumultuous behavior. What Johnson did was sit in the van, refuse Campbell's requests for identification, demand to know why he had been stopped, and question Campbell's motives. The worst and most potentially disruptive thing he did during the entire encounter was mutter "son of a bitch;" it was those words that immediately precipitated his arrest.[FN10]
>
>> FN10. There is some question as to whether Johnson directed his words at Campbell or simply said them to express his frustration. Given our standard of review, we must accept Campbell's testimony, that Johnson directed the words at him, as true. Either way, our conclusion (indeed,

serves no legitimate purpose; or

g. Congregating with other persons in a public place while wearing masks, hoods or other garments rendering their faces unrecognizable, for the purpose of and in a manner likely to imminently subject any person to the deprivation of any rights, privileges or immunities secured by the Constitution or laws of the United States of America.

(2) The person engages with at least 1 other person in a course of disorderly conduct as defined in subdivision (1) of this section which is likely to cause substantial harm or serious inconvenience, annoyance or alarm, and refuses or knowingly fails to obey an order to disperse made by a peace officer to the participants.

Disorderly conduct is an unclassified misdemeanor.

DEL. CODE ANN. tit. 11, § 1301 (2007).

Campbell's conclusion as well) that the words were not "fighting words" remains the same.

Since Johnson was arrested for the words he spoke, the question must be whether Campbell had probable cause to believe that Johnson's words were "fighting words." Again, Campbell's testimony on this point is conclusive. When asked whether Johnson's words "cause[d] anybody to fight or become angry," which is the very definition of "fighting words," Campbell's response was, "No, not that I am aware of, no fighting, no angry, no, no one became angry." Thus, Campbell himself testified that the words did not cause him, Johnson, or the onlookers to become angry or provoke anyone to fight. Here, as in Cohen, the words were emotionally expressive of Johnson's displeasure with the way Campbell was handling the situation. Johnson's words were unpleasant, insulting, and possibly unwise, but they were not intended to, nor did they, cause a fight. As Johnson's words were not "fighting words," Campbell had no probable cause to arrest him for disorderly conduct.

. . . .

Campbell believed that the simple act of speaking a profane epithet in public amounted to a criminal breach of the peace. He did not believe that the words needed to cause anyone to fight or become angry. Campbell was simply wrong about what Delaware law prohibits.

Id. at 213-214.

In light of the foregoing, the Court concludes that the state of the law at the relevant time gave Officer Gallegos fair warning that his conduct under the circumstances he confronted was unconstitutional. Accordingly, the Court determines that Officers Gallegos, Lucero, and Martinez are not entitled to invoke the defense of qualified immunity.

## 2. Whether Excessive Force was Used in Effecting Mr. York's Arrest

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right

18

to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490 U.S. at 396.  "The degree of physical coercion that law enforcement officers may use is not unlimited, however, and 'all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.'" <u>Cortez</u>, 478 f.3D AT 1125 (*quoting* <u>Graham</u>, 490 U.S. at 395).  In making the reasonableness determination, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Phillips v. James</u>, 422 F.3d 1075, 1080 (10th Cir. 2005) (*quoting* <u>Graham</u>, 490 U.S. at 396). While there is no precise formula to apply, relevant factors to consider include (1) the severity of the crime at issue; (2) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; and (3) whether he poses an immediate threat to the safety of the officers or others.  <u>Id.</u> (internal quotation omitted).  With respect to element (3), the "officer safety" or "safety of others" determination, this Court may consider whether the individual Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use allegedly excessive force.  <u>Medina v. Cram</u>, 252 F.3d 1124, 1132 (10th Cir. 2001).

An arrestee has a clearly established Fourth Amendment right to be free of excessive force during an arrest, and an arresting officer violates this right if his actions were not "'objectively reasonable' in light of the facts and circumstances confronting [him]." <u>Olsen</u>, 312 F.3d at 13-14 (*quoting* <u>Graham</u>, 490 U.S. at 397).  However,

> [t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

Cortez, 478 F.3d at 1125 (*quoting* Graham, 490 U.S. at 3976-397).

Having reviewed the totality of the circumstances, this Court cannot say as a matter of law that the amount of force alleged to have been used in effecting the arrest of Mr. York was permissible and objectively reasonable in light of the particular facts and circumstances confronting the individual Defendants in this case, such that the protections of qualified immunity should apply.  See Cortez, 478 F.3d at 1128 ("Should the officers move for qualified immunity on an excessive force claim, a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have not thought the force constitutionally permissible (violates clearly established law.").  As an initial matter, the Court notes that the crime for which Mr. York was being arrested—disorderly conduct—is a petty misdemeanor. See LAS CRUCES, N.M., CODE § 19-87(b) (1988).  "'[P]etty misdemeanor' means any offense so designated by law or if upon conviction a sentence of imprisonment for six months or less is authorized."  NMSA 1978 § 31-1-2(L).  As such, petty misdemeanors represent the least serious class of crime in New Mexico.  See Incorporated County of Los Alamos v. Johnson, 776 P.2d 1252, 1254-55

(N.M. 1989) (Baca, C.J., specially concurring).

Despite the fact that Mr. York was being detained for a relatively minor offense, Officer Gallegos nevertheless decided it was essential to achieve the element of surprise during the arrest.[4] To that end, without first informing him that he was being placed under arrest, Officer Gallegos reached out and grabbed Mr. York's arm. Mr. York pulled his arm back. The fact that he did so formed the basis for Officer Gallegos's decision to charge Mr. York with resisting arrest. [Doc. 16; Exh. A, Oct. 17, 2006 depo. of Chris Gallegos]. Mr. York, however, maintains that he "pulled [his] arm back as a reflex action, because [he] had no idea what was happening[,]" and, when grabbed, was not even looking at Officer Gallegos. [Doc. 16; Exh. B, Nov. 14, 2006 affidavit of James York]. In any event, when

---

[4] The following exchange is from Officer Gallegos's deposition:

> Q:   Okay. Now the fact is that you didn't tell Mr. York that you were placing him under arrest, did you?
> A:   No.
> Q:   You just reached out and grabbed him and said turn around?
> A:   Exactly.
> Q:   And when you reached out and grabbed him, he had no idea what was happening, did he?
> A:   Well, I think he did because he says, "Oh, no."
> Q:   Well, actually, you purposely didn't want him to know that you were about to arrest him, right?
> A:   Exactly.
> Q:   You wanted the element of surprise?
> A:   Correct.
> Q:   Okay. And you wanted to surprise him and get his hands cuffed before he could figure out what was going on?
> A:   Exactly.

[Doc. 16; Exh. A, Oct. 17, 2006 depo. of Chris Gallegos].

Mr. York pulled his arm back, Officer Lucero attempted to grab Mr. York's hand.  At that point, Officer Gallegos effected an arm-bar leverage takedown.  Mr. York contends that when he was thrown to the ground, he struck his head and shoulder and was dazed, and because of his pain and disorientation was unable to comply with the Defendants' commands to untuck his arms from underneath his body.  Upon seeing this, Officer Martinez removed the cartridge from his Taser; yelled out "Taser"as a warning to Officers Gallegos and Lucero; and placed the Taser on the back of Mr. York's neck, ordering him to stop resisting.  Although Officer Martinez was prepared to "drive stun" Mr. York (use the Taser so that it administers a small shock) he did not do so.  When Mr. York was directed to roll over onto his right side, he replied, "I can't.  I think you broke my arm."  [Doc. 16; Exh. E, belt tape].  Mr. York contends that since the date of his arrest, he has experienced frequent and severe headaches; dizziness; neck and shoulder pain; weakness in the arms; and wrist and thumb pain.  He has been billed in excess of $80,000 for doctor, hospital, and physical therapy services.  [Doc. 16; Exh. C, Nov. 14. 2006 affidavit of James York at 4].

There is no evidence in this case that Mr. York was attempting to evade arrest by flight, and the allegation that he was resisting arrest is disputed.  See Phillips, 422 F.3d at 1080.  There also is a material factual dispute as to whether the individual Defendants' actions in physically grabbing Mr. York's arm and hand without first explaining that he was being placed under arrest caused Mr. York to tense up or reflexively pull his arm away, such that Officers Gallegos, Lucero, and Martinez then believed themselves justified in (1) subduing Mr. York by way of an arm-bar leverage takedown; (2) attempting to force Mr.

York, now disoriented and dazed from having struck his head on the ground, to untuck his arms from underneath his body; and (3) threatening Mr. York with a Taser shock.  See Medina, 252 F.3d at 1132 (affirming propriety of considering whether officers' own reckless or deliberate conduct during seizure unreasonably created the need to use force and deeming such conduct relevant provided it is "immediately connected" to the seizure and threat of force).

Lastly, notwithstanding the well-accepted maxim that the reasonableness consideration must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation[,]" Graham, 490 U.S. at 396-97, the evidence here, when viewed in a light most favorable to Mr. York, does not support the conclusion that such circumstances were present in this case.  To the contrary, rather than be forced to make a split-second judgment under rapidly evolving circumstances, the evidence demonstrates that Officer Gallegos took the time to step away from Mr. York and confer privately with Officer Lucero as to whether Officer Lucero believed there existed probable cause to arrest Mr. York.  [See Doc. 16 at 5; Doc. 21 at 6].  Convinced that the elements had been met, Officer Gallegos then returned to Mr. York, whose focus was not on Officer Gallegos but on replacing items that had fallen out of his wallet, and employed the surprise-arrest technique described above.  Because the Court cannot say as a matter of law that the individual Defendants are entitled to the protections of qualified immunity with respect to the amount of force used during Mr. York's arrest,

23

their summary-judgment motion will be denied on this point.

### b. Mrs. York's Claims with Respect to the Individual Defendants

Mrs. York has asserted a claim for the deprivation of her Fourteenth Amendment liberty interest.  More specifically, Mrs. York contends that she was subject to the intentional or reckless infliction of emotional distress as a result of having witnessed the individual Defendants employ excessive force against Mr. York.  [Doc. 21 at 22].  The individual Defendants have moved for summary judgment on the ground that Mrs. York's claim is not actionable.  [Doc. 16 at 23].

It is important to distinguish Mrs. York's § 1983 claim for intentional infliction of emotional distress from the state-law intentional-infliction-of-emotional-distress claim she appears to set forth in Count VII of the complaint.  [See Doc. 1 at 9].  This is because § 1983 "'imposes liability for violations of rights protected by the constitution or laws of the United States, not for violations of duties of care arising out of tort law. Remedies for the latter type of injury must be sought in the state court under the traditional tort-law principles.'" Archuleta v. McShan, 897 F.2d 495, 496 (10th Cir. 1990) (quoting Wise v. Bravo, 666 F.2d 1328, 1333 (10th Cir.1981)).  In Archuleta, the Tenth Circuit held that a plaintiff has no liberty interest to be free from emotional trauma suffered as a result of observing allegedly excessive police force directed entirely at another.  Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990).  Ruling that the constitutional rights of a three-year-old boy were not violated as a result of having witnessed the violent arrest of his father, the Court explained that

> [t]he problem with plaintiff's claim is that no state conduct was directed at him, and he cannot establish that defendants had the requisite intent to violate his rights. He was merely a bystander who was asserting indirect and unintended injury as a result of police conduct directed toward another.
>
> We use the term bystander to mean someone who witnesses police action but who is not himself or herself an object of that action. As such, a bystander is unable to assert the kind of deliberate deprivation of his or her rights necessary to state a due process claim under section 1983.

Id. at 498.  In this case, Mrs. York was similarly a bystander to the treatment Mr. York received at the hands of the individual Defendants.  Because there is no allegation that the individual Defendants' actions were directed toward Mrs. York, § 1983 is not the proper vehicle by which Mrs. York may advance her intentional-infliction-of-emotional-distress claim.  Accordingly, summary judgment will be entered for the individual Defendants on this point.

### 3. Summary Judgment as it Pertains to Defendant City of Las Cruces

Plaintiffs next argue that Defendant City of Las Cruces inadequately trained and supervised the individual Defendants, as evidenced by their lack of understanding as to (1) what constitutes the crime of disorderly conduct; and (2) when, if ever, it is appropriate to effect the type of "surprise arrest" used here.  Plaintiffs assert that this inadequate training and supervision demonstrate deliberate indifference on the part of the City, and that there is a direct causal link between Plaintiffs' injuries and the substandard training the individual Defendants received.  [Doc. 21 at 22-23].  The City argues that Plaintiffs' "failure to show a constitutional violation on the part of Officers Gallegos, Lucero, and Martinez is

dispositive as to the liability of the City of Las Cruces [and that b]ased on the lack of a constitutional violation, the Court should also grant summary judgment to the City of Las Cruces." [Doc. 16 at 24].  As evidenced by the foregoing discussion, the Court disagrees with the City's position that there has been no showing of a constitutional violation; the Court therefore turns to the remaining elements that must be satisfied before municipal liability may be imposed on Defendant City of Las Cruces.

While municipalities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights, a municipality will not be held liable for the actions of its employees under a theory of *respondeat superior.*  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978).  While municipality liability may be imposed for a city's failure to train, "the inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989).  In this case, to establish the City's liability under § 1983 for inadequate training of the individual Defendants, Plaintiffs must first prove the training was in fact inadequate, and then demonstrate that (1) the individual Defendants violated Plaintiffs' constitutional rights; (2) the violation(s) occurred under circumstances that were usual and recurring situations for City police officers; (3) the inadequate training demonstrates the City's deliberate indifference to the rights of arrestees; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.  See Brown v. Gray, 227 F.3d 1278, 1286 (10th Cir. 2000) (addressing Fourth Amendment excessive force claim); see also

Pierce v. Gilchrist, 2007 WL 162522, at *4 (W.D.Okla. Jan. 18, 2007) (applying same elements in context of alleged inadequate training of city forensic chemist).

### a. Inadequate Training as to What Constitutes Disorderly Conduct

There is evidence in the record that the training the individual Defendants received with regard to determining what constitutes the offense of disorderly conduct was inadequate. For one thing, Officer Gallegos testified that, as a general matter, he believes an individual commits the offense of disorderly conduct if that individual uses profanity and "somebody appear[s] to be offended[]" by it; more specifically, Officer Gallegos explained that he made the decision to arrest Mr. York because Mr. York "shouted a profanity in a crowded public area, causing at least three people to react." [Doc. 16; Exh. A, Oct. 17, 2006 depo. of Chris Gallegos at 65; Doc. 16; Exh. A, affidavit of Chris Gallegos at 3]. But New Mexico case law explains that disorderly-conduct statutes may only constitutionally be applied to "words alone" conduct when the words amount to "fighting words." See James M., 806 P.2d at 1068. In turn, both state and federal case law hold that "fighting words" are words that, no matter how loud or offensive, are likely to incite listeners to breach the peace, Hawkins, 991 P.2d at 992, or amount to "an invitation to exchange fisticuffs." Texas v. Johnson, 491 U.S. at 409. Of perhaps even greater importance to the analysis, however, is the fact that Officer Gallegos testified that his understanding of what constitutes the offense of disorderly conduct is based on training he received at the police academy approximately eight years ago, and that while advanced training in the legal aspects of his work is available

27

to those who "put in for" it, he has never done so.[5]  [Doc. 16; Exh. A, Oct. 17, 2006 depo.

of Chris Gallegos at 66-67].

Officer Martinez was similarly unable to articulate just what constitutes the offense

of disorderly conduct.  At his deposition, Officer Martinez first defined disorderly conduct

as including profane conduct that offends those around the speaker.  But then the following

discussion took place:

> Q:    Now, if someone wears a T-shirt that says "fuck" on it,
>        that would be profane conduct, right? And we can all
>        agree that that's pretty much profane conduct, can't we?
> A:    Yes.
> Q:    Okay. And he walks down the street wearing that shirt,
>        and someone sees that shirt and makes a scowl. They're
>        irritated. They're offended. Can you arrest him? Is it
>        your understanding that he has violated the ordinance of
>        disorderly conduct?
> A:    No.
> Q:    Why not?
> A:    Because he's—he's—he's not committing any unlawful
>        act.
> Q:    He's engaging in profane conduct and it's offended
>        someone. Now, you just told me that that's what made
>        something disorderly conduct.
> A:    But it's his shirt. It's not him. I mean, he has the right to
>        wear whatever he wants. I can't go and tell him what to
>        wear.
> Q:    Okay. Why not?
> A:    Because he has his rights.
> Q:    Where do those rights derive from?
> A:    Freedom of speech.

---

[5] That Officer Lucero agreed "without a doubt" with Officer Gallegos's assessment that
Mr. York had engaged in disorderly conduct because he "call[ed] somebody a bitch . . . loud and
somebody else turn[ed] around" demonstrates Officer Lucero's equally flawed understanding of
what constitutes the offense.  [See Doc. 16; Exh. B, Las Cruces Police Department Statement of
James & Jody York at 10].

> Q:     Okay. So it is speech, just like saying bitch is speech, right? Right?
>
> A:     Yes.
>
> Q:     Okay. So if giving offense to those around you is not the answer to what tends to disturb the peace, after thinking about it now, have you got a better idea for how to define what tends to disturb the peace?
>
> A:     No.
>
> Q:     Okay.
>
> A:     *You said you had the answer. What is it?*

[Doc. 16; Exh. I, Oct. 18, 2006 depo of Gregory Martinez at 78-79 (emphasis added)] . This Court concludes that the record evidence is sufficient to support a determination that the individual Defendants were inadequately trained with respect to the offense of disorderly conduct.

For reasons already explained, the Court also finds that the individual Defendants acted without probable cause when they arrested Mr. York for disorderly conduct. Consequently, Plaintiffs have satisfied the next element in the inadequate-training analysis inasmuch as they have demonstrated that the individual Defendants violated Mr. York's constitutional right to be free from an unreasonable seizure. Moreover, for purposes of this discussion, the Court assumes without deciding that Mr. York's arrest occurred under circumstances that were usual and recurring situations for City police officers.

The Court, however, determines that Plaintiffs' evidence falls short on the issues of the City's deliberate indifference and causation. "Deliberate indifference means more than simple or even heightened negligence." Estate of Smith v. Silvas, 414 F.Supp.2d 1015, 1018 (D.Colo. 2006). It requires "an act or omission purposefully committed by a person who

must have realized that the conduct was unnecessarily dangerous or which conduct was done heedlessly or recklessly, without regard to the consequences, or without regard to the rights and safety of others." Zuchel v. City and County of Denver, Colo., 997 F.2d 730, 735 (10th Cir. 1993). As for the element of causation, "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997). "Clearly these burdens are very difficult to meet, but this is intentionally so, lest the law devolve into '*de facto respondeat superior* liability.'" Estate of Smith, 414 F.Supp.2d at 1019 (*quoting* City of Canton, 489 U.S. at 392); see also Bd. of County Comm'rs of Bryan County, Okl, 520 U.S. at 403 ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*.").

The Tenth Circuit has explained that

> [t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Carr v. Castle, 337 F.3d 1221, 1229 (10th Cir. 2003). It bears repeating that a finding of deliberate indifference requires "a showing that 'the need for more or different training is so

30

obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need[.]'" Brown, 227 F.3d at 1288 (*quoting* City of Canton, 489 U.S. at 390.

In this case, Plaintiffs assert that

> *[t]he extent of the lack of training* with regard to what constitutes disorderly conduct . . . demonstrates deliberate indifference on the part of the City; moreover, . . . given that none of the officers has any understanding of the Constitutional aspects of a disorderly conduct charge, there is a strong indication that the supervision, as well as the training, of these officers in regard to th[is] matter is also deliberately indifferent. Finally, there is clearly a direct causal link between this inadequate training and supervision and the injuries suffered by the Plaintiffs herein.

[Doc. 21 at 23 (emphasis added)].  Thus as in Carr, where the plaintiff argued that the training received by Oklahoma City police officers who fatally shot his decedent was lacking, Plaintiffs' argument here is that there was an absence of specific training that would have helped the individual Defendants during their encounter with Plaintiffs.  See Carr, 337 F.3d at 1230.  Also as in Carr, however, Plaintiffs here have "provide[d] no evidence that the City made . . . deliberate choices regarding any training. Instead [Plaintiffs] merely enumerate[] the . . . ways in which [they] contend[] the Officers were inadequately trained, but without proffering any evidence of knowledge of the purported deficiencies on the part of the City." Id. at 1229.  Plaintiffs have not illustrated how the City consciously chose to disregard the risk of harm of a constitutional violation; to the contrary, Officer Gallegos testified that advanced training in the legal aspects of police work is, in fact, available, but

that he simply chose not "to put in for" it.  [See Doc. 16; Exh. A, Oct. 17, 2006 depo. of Chris Gallegos at 67].  That such training is indeed available to those who opt to pursue it is fatal to Plaintiffs' allegation that the City was deliberately indifferent in that it acted or failed to act in a manner substantially certain to result in a constitutional violation.

The Court also concludes that Plaintiffs have failed to establish a direct causal link between the individual Defendants' inadequate training and the injuries sustained.  Although Plaintiffs assert that "there is clearly a direct causal link between th[e] inadequate training and supervision and the injuries suffered by Plaintiffs[,]" they have identified no specifics that might be said to have led directly to the asserted constitutional violation.  See Carr, 337 F.3d at 1231 ("Carr has identified nothing in his laundry list of assertedly inadequate training that can be said to have led directly to the use of excessive force against [decedent].").  In the Tenth Circuit, "a general lack of training is insufficient" to show that deficient training is closely related to the ultimate injury.[6] Id.; see also Lopez v. LeMaster, 172 F.3d 756, 760 (10th Cir. 1999).

### b. Inadequate Training as to the Use of Force

Plaintiffs also argue that the City is liable for having inadequately trained the

---

[6] See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978):

It is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Therefore, in order for liability to attach in a failure to train case, the identified deficiency in a city's training program must be closely related to the ultimate injury, so that it actually caused the constitutional violation.

individual Defendants as to what amount of force may be used during an arrest.  According to Plaintiffs,

> [t]he extent of the lack of training with regard to  . . . the circumstances, if any, under which "surprise arrest" might be appropriate demonstrates deliberate indifference on the part of the City; moreover, assuming Officer Gallegos believes it appropriate to make "surprise move" arrests as a matter of course, . . . there is a strong indication that the supervision, as well as the training, of these officers in regard to th[is] matter is also deliberately indifferent.

[Doc. 21 at 23].  The Court, however, does not believe that Plaintiffs' evidence supports a finding that the individual Defendants were inadequately trained as to the use of force during an arrest.

When asked where Officer Gallegos learned the "surprise arrest" technique he employed here, Officer Gallegos replied, "[t]hrough experience."  When asked what he was taught about effecting an arrest under the circumstances he encountered here, Officer Gallegos replied, "Probably, 'Sir, I need you to turn around. Place your hands behind your back. You're being placed under arrest for such and such.'"  [See Doc. 16; Exh. A, Oct. 17, 2006 depo. of Chris Gallegos at 114].  Officers Lucero and Martinez also testified that, based upon their training, they would not have effected a surprise arrest under the circumstances but, instead, would have informed Mr. York that he was being placed under arrest.  Officer Lucero testified that he was never trained to arrest and handcuff somebody without first giving verbal commands, and that it is only when verbal commands fail and there is a negative reaction from the arrestee that Officer Lucero will escalate the encounter.  [See

Doc. 16; Exh. G, Oct. 18, 2006 depo. of Frank Lucero at 77-78].   Officer Martinez similarly

testified that if he had been the officer arresting Mr. York, he would have told Mr. York that

he was being placed under arrest and to turn around with his hands behind his back.  Officer

Martinez testified that has was never trained to effect an arrest without first explaining to the

arrestee that he was being placed under arrest and attempting to complete the task peaceably.

[See Doc. 16; Exh. I, Oct. 18, 2006 depo. of Gregory Martinez at 40-44].  In short, Plaintiffs'

evidence does not demonstrate that the City inadequately trained its police officers as to the

amount of force to use during an arrest.[7]  The fact that Officer Gallegos chose to effect a

surprise arrest under the circumstances is not, standing alone, enough to indict the City's

training program or impose municipal liability upon it.  For these reasons, the Court will

enter summary judgment for the City.

## III. CONCLUSION

To paraphrase the Third Circuit, this Court is cognizant of the important role that the

police play in keeping citizens safe, and does not lightly second guess the decisions made

by police officers in the field.  See Johnson, 332 F.3d at 205.  However, as was the situation

in that case, the individual Defendants here "went too far; [they] stepped over the line that

---

[7]        That a particular officer may be unsatisfactorily trained will not
alone suffice to fasten liability on the city, for the officer's
shortcomings may  have resulted from factors other than a faulty
training program[, a]nd plainly, adequately trained officers
occasionally make mistakes; the fact that they do says little about
the training program or the legal basis for holding the city liable.

City of Canton, 489 U.S. at 390-391.

separates zealous police work from an unsupportable intrusion on a person's liberty." Id. Consequently, the Court determines that the individual Defendants are not entitled to the protections of qualified immunity with respect to Mr. York's claims, and therefore their motion for summary judgment must be denied as to those claims. The individual Defendants are, however, entitled to qualified immunity (and therefore the entry of summary judgment) with respect to the claim asserted against them by Mrs. York. Finally, for the reasons discussed above, the City's motion for summary judgment will be granted.

**IT IS, THEREFORE, ORDERED** that the *Motion for Summary Judgment as to Plaintiffs' Federal Claims* [Doc. 15], is **DENIED** with respect to Plaintiff James York's claim against individual Defendants Chris Gallegos, Frank Lucero, and Gregory Martinez that he was arrested without probable cause, in violation of the Fourth Amendment;

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment as to Plaintiffs' Federal Claims* [Doc. 15], is **DENIED** with respect to Plaintiff James York's claim against individual Defendants Chris Gallegos, Frank Lucero, and Gregory Martinez that they employed excessive force during the course of his arrest, in violation of the Fourth Amendment;

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment as to Plaintiffs' Federal Claims* [Doc. 15], is **GRANTED** with respect to Plaintiff Jodie York's claim against individual Defendants Chris Gallegos, Frank Lucero for violations of her Fourteenth Amendment right to be free from the intentional infliction of emotional distress:

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment as to*

*Plaintiffs' Federal Claims* [Doc. 15], is **GRANTED** as it pertains to Defendant City of Las

Cruces.

     **SO ORDERED** this 31st day of May, 2007, in Albuquerque, New Mexico.


                                 **M. CHRISTINA ARMIJO**
                                 United States District Judge